Case No. 16-1245, United Airlines, Inc. et al. Petitioners v. FEDERAL ENERGY REGULATORY COMMISSION, et al. Mr. Adichie, for the petitioners, Ms. Chu, for the respondents. Good morning. May it please the Court, Steve Adichie on behalf of petitioners in this matter. The Commission's determination in this case that it categorically lacks any authority to direct the carrier here to cease and desist from selectively refusing to transport particular petroleum products is plainly in error. The challenged orders misconstrued the Commission's fundamental authority under ICA Section 1-4, 1-6, and 15-1 of the ICA and are in direct conflict with established case law and agency precedent. Contrary to the challenged orders, artificially labeling an action as an abandonment does not curtail or otherwise limit the Commission's statutory authority. The Commission's definition of abandonment in this matter flies in the face of the Act's own unambiguous definition of abandonment. Agency and judicial precedent directly contrary to the challenged orders, including a Supreme Court case, and a pipeline common carrier's duty and obligation to provide transportation upon reasonable request. Indeed, FERC's abandonment and related holding out interpretation effectively negates the transportation upon reasonable request provision of Section 1-4 of the Interstate Commerce Act. Could you start out by addressing standing, please, and the argument that there's no standing here because the chain of inferences for injury is too much? The focus in standing is injury causation and redressability. Here, as this Court said in the Carpenter decision, where the government's action has taken away an integral part of the business, including a supply, a supply chain, or a source of supply, and removing that source of supply causes an increased cost. Do you all use Enterprise? Pardon me? Do you all use the Enterprise pipeline? Yes. In the proceedings below, we submitted affidavits and verified statements that indicated that United Airlines, all the complainants. There was prior use and perhaps future use, but was there current use at the time? Were you using the pipeline at the time they withdrew? United was not using the pipeline. It was relying on that pipeline as a source. UPS Fuels was using it as a disklet, and then problems with the pipeline caused it to stop using it. But as indicated, that source of supply, they've indicated they would use it during the settlement, without the settlement, and in addition, the absence of the disklet and jet fuel service on that pipeline, United evaluated that as being approximately increasing their cost by about $3 million. That was not disputed anywhere on the record. Enterprise, in its answer to the complaint, challenged petitioners' ability to enforce the settlement, but nobody challenged the economic harm that was indicated by petitioners. And here, not in addition to the fact that there is a monetary harm as presented by United, there's also an economic harm in the fact that what the commission's decisions have done have fundamentally changed the dynamics between shippers and carriers. As carriers already conceded, the challenged orders have now required it to change its contractual obligations. So I'm missing the distinction between the harm that you're talking about right now and the harm that you just got done talking about. So the harm that you're talking about right now, I take it— Two separate harms. Yeah, and what's the distinction between the two? What's the first one again? The first one was an actual monetary harm. They've identified it and estimated that the actual monetary harm could cost them additional monetary costs. But from what? From the risk that there might be discontinuation in the future? From the discontinuation. From the discontinuation. That already occurred? That occurred. That it would result in excess or an increase in cost in actually obtaining supply in the Illinois area. So that's done. That's done. Uh-huh. Now the second—now in addition to that monetary harm, the Commission's orders have fundamentally changed the dynamic between shippers and carriers. First of all, carriers already admitted that as a result of these orders, they are now going to have to change the way they contract going forward with respect to settlements and right agreements. Now in addition to that, these orders have now given the pipeline a very substantial tool. And that tool is that they can, at any point, discontinue the transportation of a particular product in face of a challenge by a shipper to its rates, to its practices. And in doing so, that shipper will be foreclosed from pursuing any type, any type of retribution from the standpoint of it couldn't go to the Commission because the Commission has already said, we consider that an abandonment. We will not have jurisdiction. You can make arguments about discrimination and there are arguments that you could make beyond— that aren't precluded by the abandonment finding, right? No, because if they can, if they can discontinue the transportation of product, and the Commission has no authority to review that, discrimination doesn't become a factor. We've raised discrimination in the complaint below. We haven't highlighted that in the appeal today, strictly because that is a factual analysis that would need to be done pursuant to Section 1.4. So you might be right that in that circumstance, the abandonment principles that the Commission has adopted would be binding in the subsequent hypothetical scenario that you lay out. But the issue that we're facing here is, do we have a justiciable controversy before us? And part of what factors into our analysis is that if that set of circumstances came to pass, and that there was the hypothetical sequence of events that you lay out, and then somebody brought a challenge to the Commission, the Commission said, can't you read, look at our prior decision? We said this was an abandonment, you're out of luck. Well, then there'd be judicial review at that point. No. Why not? Because in that context, again, the question would be, in fact, what would happen in that context is the pipeline would start to play a shell game. For instance, if you filed a complaint saying, I've made a request for transportation, the pipeline rejects that and then terminates or abandons that product transportation. You go to the Commission and file a complaint. The pipeline can turn around and temporarily put that service right back into play, by mooting your complaint where it'd have to be dismissed. Then when the pipeline turns around. Well, if that were true, then the Commission would review it. It wouldn't be an abandonment. No, because the fact of the matter is, is that under their rules, you can put it into service, take it out of service without review, because what would happen if once they put it back into service on a temporary basis, that would be a tariff filing. Now, when they take it out, it would also be a tariff filing. Under 15-7, it's unreviewable. I mean, we can ask the Commission this. I guess it is not immediately apparent to me that if an entity engaged in games of that sort that's just purely designed to circumvent review, that that would be a successful strategy. I mean, maybe in the physical world it's possible. It's just that that doesn't seem to be the necessary import of what the Commission has done so far. But what I think, and maybe I'm not making it clear enough, but in this context, one of the major injuries is this change in dynamic between carriers and shippers. And with the ability of a pipeline to fundamentally stop transporting a product, if I'm going to, as a shipper, if I'm going to request transportation on that pipeline, I may have to invest significant sums. Now, a factor that I need to now take into account, which I didn't have before, is whether that pipeline at the drop of a hat can pull the product. I could lose a lot of money in that. Do you have instances where there have been negotiations that have been affected by this rule? Well, the pipeline itself said that going forward from now, they will physically change the way that they contract. And in here, what the Commission has done is... And you've entered into those negotiations and have found that it costs more than it did before? What has cost more? You're saying that the negotiation strategy between the two has been changed because of this preference for the pipeline. And I'm wondering if you have some concrete examples that that has actually happened. I have no concrete examples in the record, but I can say that it has been a function in the United, and UPS fuels are active participants in cases. And this is not the first time where a pipeline has said, you know, we can always just pull the product. And that is a lingering major factor in all of the disputes and negotiations between carriers and shippers coming today because of that main fact. The pipeline can pull transportation of a product at any time, and shippers will not have the benefit of Section 1.4 of the Interstate Commerce Act to ask for a review to whether that was a reasonable request for transportation and whether the pipeline was actually living up to its duty providing transportation upon reasonable request. I don't want to stop the questions about standing if there's still more, but even if we assume you get beyond injury traceability and redressability, why isn't this moot? I want you to get to that at some point. Okay. As this Court has indicated in Better Government and the City of Houston, a petitioner, if you challenge a government action, as well as the legality of that action that engendered the government action, if the government action terminates or expires, that does not moot the legality challenge, the facial challenge to the policy that engendered the original action. And here the action was allowing the termination, not enforcing the settlement agreement to require the transportation. And why didn't you challenge the 2013 tariff in which the so-called abandonment took place? You didn't challenge that. The protest order? Right. And the protest order was done via a tariff. It was done with a tariff filing. The Commission acted under 15-7 of the Interstate Commerce Act. Now, the Supreme Court decision in Southern, as well as this Court's decision in Arctic and Resolute and the two ExxonMobil decisions, have made it clear that the Commission's determination not to investigate under 15-7 is unreviewable. We could not take that to this Court. Yeah. I guess it depends on whether it was a 15-7 determination what the Commission says. I think the Commission takes some issue with that, but you think it necessarily was. I believe it's the only way that it could be. A 15-7 is the only authority that it has. And even if 15-7 somehow doesn't apply, which I don't think is the case, the Commission plainly reopened this matter. Just a simple comparison between the rehearing order and the protest order indicates that the Commission retook on this, reexamined the entire issue of its abandonment policy and whether it could inhibit some way a pipeline's ability to terminate product carriage, even in the face of a jurisdictional agreement. And in addition to that, the Commission actually changed its position between the protest order and the complaint order, where in the protest order it indicated that it did not have jurisdiction over what it considered the abandonment, in that case, that Enterprise took, but indicated and identified that if the abandonment was associated with a jurisdictional agreement, the Commission did have authority under Section 13 and Section 8 in order to address or remediate that violation of the act. Now, when it came to the complaint order, the Commission changed its tune. It said, not only can we not address abandonment, but even when that abandonment is associated with a jurisdictional agreement, we will not enforce that jurisdictional agreement. Nowhere in the protest order did it ever limit that factor. It simply said that it had the ability to redress that violation. If you filed a Section 13 complaint. We filed the Section 13 complaint. However, the Commission then turned around and said, no, we only have authority to do monetary damages, which in and of itself makes no sense, given the fact that if the Commission has jurisdictional authority for an Interstate Commerce Act violation under Section 13 and exercises its right under Section 8, the Commission's orders are completely devoid of any discussion of how they could have partial jurisdiction. If the Commission has jurisdiction under Section 8 for a violation of the act, it would similarly have jurisdiction under 15-1 for the same exact act. We'll give you back a couple minutes. Okay. In this proceeding, one of the main issues is whether I think it's time for the intervener. I mean, wait a second. I'm confused here. Where are we? No intervener in this case. No intervener. We'll now hear from counsel for further. Okay. Thank you. We'll give you a couple minutes back after that. Sorry. Let's just put the intervener on notice in the next case that you will be heard from. May it please the Court. Susanna Chu for the Commission. What we have here is a broad policy challenge that's disembodied from the Commission's orders on review. The petitioners can't show a real stake in the outcome of this litigation. As it became clear here today and in the affidavits that the petitioner pointed to, both United and UPS had ceased being shippers on the Enterprise pipeline at the time of the cancellation of service. But the main point, really, is if it were really important for the petitioners to obtain service over this particular pipeline, they could have filed a complaint as early as March 2013 asking the Commission to prevent the pipeline from discontinuing service. They didn't do that. Instead, they joined with other parties in a complaint that asked the Commission to award either specific performance on the settlement agreement or money damages. Now, leaving aside the fact that these particular petitioners weren't parties to this settlement agreement, these petitioners joined in that complaint, and they participated in the proceedings before the Commission. They participated in two years' worth of settlement discussions with the pipeline over the extent of damages from the pipeline's breach of the settlement agreement. So to the extent that petitioners are trying to mount this broad policy challenge, they've done too little too late to preserve their ability to do it. What do you do with your friends' argument that they want, at least UPS had access to the pipeline and now no longer has access to the pipeline? Isn't that a harm? As I understand it, UPS actually in its affidavit, the affidavit that's attached to Petitioner's Reply Brief, which is the second-to-last page of Attachment 1, UPS said that it had suspended shipments over enterprise prior to May 2013 due to operational issues. So they had suspended shipments, as I understand it, for reasons separate and apart from this cancellation of service. And the same for United. In Paragraph 3 of a United affidavit at JA212, United stated that it had not shipped over enterprise TEPCO for the past two years. This was as of June 2013. They did include some speculation that they might have some fuel suppliers that may have used the enterprise pipeline, but they didn't testify that they actually had used the pipeline. What about the notion that contract negotiations right now are being affected by this policy announced by FERC? I don't think that the petitioners are barred in any way from bringing a complaint to the commission and ultimately to the court to the extent they suffer any real harm in the course of any negotiations with some other pipeline. Now, I don't want to speak for the pipeline in this case, but as I understand it, when petitioner was saying that pipeline has indicated that this case has changed its negotiating stance and that it can abandon service at will, two things. I believe pipeline only acknowledged that the commission will hold them to their settlement agreements. So if they agree to provide rates at particular service of, excuse me, if they agree to provide services at particular rates, if they breach that agreement, the commission will order them to make the other party whole through money damages or other actions within their jurisdiction. There's no new policy here that is affecting contract negotiations going forward. The particular orders in this case, finding that a pipeline has authority to abandon distinct services, is consistent with prior commission orders. So that's the merits because they challenged that. They say it's not consistent with past decisions. And typically for purposes of justiciability, we assume the correctness of their arguments on the merits. So if we assume that they're right in saying that the decision in this case, the commission's decision in this case, that this is just a mere abandonment of a distinct category and that's something that we can't review, assuming that that's a new doctrine. Because as I understand it, I think we do assume that. Then their argument would be, well, we didn't know that before. And now that we know that, it's having a present effect on us because now we have to factor in the risk of discontinuation, which wasn't in play before. And that's a present harm that we're suffering, the risk of discontinuation that's factoring into our business decisions. Right, and that's all that they have, which I think even that, even assuming that they're right on the merits, assuming that that harm isn't sufficient for Article III standing purposes, I think the best case they have on that might be the Great Lakes case. Right, so Great Lakes seemed to have a theory that was pretty parallel to that theory. Right, but the difference there is that in Great Lakes, the commission actually attached a particular condition to a certificate of public convenience and necessity that it had issued to the gas pipeline. And that particular condition that was imposed on the certificate granted to the petitioner had immediate business consequences because it required the pipeline to lock in contracts for 33 years. The court even noted that it might affect the pipeline's credit rating. That's really an opposite to the situation here, where petitioners participated as complainants before proceeding, but they weren't even parties to the settlement agreement that gave rise to the litigation. But isn't it parallel to Great Lakes in that then you could reconceive of this, the commission's ruling in this case, as basically telling everybody in the industry, effectively every contract now has a provision in it that says that the pipeline can always just decide to discontinue a particular service. That's just something that has got to be read into every agreement. Is that not right? Well, it's not right that it's a new policy going forward. I mean, that reading is fully consistent with both the commission's precedents and also with the Interstate Commerce Act, which has no provision. So let's get then just to go back on that. So let's just assume that they're right on the merits on that, too, that this is a new thing. So for standing purposes, let's just assume that we have to assume that double layer of assumptions. Okay. Then on that, if we assume that this is new and, therefore, they didn't know before that the risk of abandonment existed and was not remediable, at least by specific performance, is your answer to that, well, there's still a remedy with monetary damages? Or is there something else that you would say? That's right. There still is a remedy with monetary damages, but also to the extent that it comes up in a negotiation with another pipeline or with Enterprise again in the future, they could file a complaint with the commission, asking the commission to prevent the proposed abandonment. There's nothing stopping them from filing a complaint whenever an actual live controversy emerges. And the commission presumably would be bound by its decision in this case and would say, because it's an abandonment, we can't do anything about it. Presumably, yes, but the binding effect of a particular commission order isn't sufficient to sustain standing, which we know from this Court's prior case law. So just one point I just want to clarify. The petitioners say that the commission changed its position from the 2013 protest order to the complaint order. I just want to clarify that there was no such change in position. Paragraphs 26 and 27 of the protest order make very clear that the commission does not possess the authority to, as a potential equitable remedy, prevent or delay the abandonment of service of an oil pipeline. So the commission did make that clear in the protest order. In addition, I would say that Paragraph 26, there's a sentence that talks generally about the commission's jurisdiction to appropriately remedy the situation. Footnote 13 to Paragraph 26 cites a natural gas pipeline case in which FERC lacked jurisdiction to require a pipeline to engage in specific performance, but it ordered damages to remedy the breach. So the protest order and the complaint order, there is no change in position between those two orders. Do you think that the 2013 tariff order was judicially reviewable? I think for purposes of resolving this case, it's not necessary to decide whether that particular order was reviewable, but I think it is an open question whether Southern Railway governs this particular case or that particular order. Because the commission didn't say that it was accepting the tariff abandonment under Section 15.7. Section 15.7, which is printed in the addendum to our brief at A14, gives the commission the power to suspend or investigate rate filings by oil pipelines. It's not clear to me whether that section would encompass an oil pipeline's filing of a tariff that cancels service entirely. So I think that – But there's no reason – what else – the United side of 15.7, when it filed the protest, and the commission, I think, and then the commission didn't say anything to the contrary in its resolution, right? I don't believe so. I don't think the commission addressed the issue. And so that's one reason why this issue may not be properly – excuse me, I just mean that perhaps this case is not the best vehicle for considering that particular issue. But I will say that it is a question whether or not Southern Railway would preclude review of that particular order. The bottom line from our perspective is that the petitioners just did too little, too late, to preserve this broad challenge to the policy of the commission by, first, joining in a complaint that asks for either specific performance or damages, and then continuing in the administrative proceeding, continuing to participate through two years of damages negotiations with the pipeline, and then waiting, actually waiting an additional five months. Let me go back and ask you. This is a hypothetical. Let's imagine that the commission had arrived at this policy on abandonment through formal rulemaking. They put out for notice and comment that they're going to interpret their rules such that – to make clear that the commission doesn't have authority to stop a pipeline that wants to cease transportation of a certain product. If they had done that, would these petitioners have standing as an aggrieved party under the APA? Possibly, Your Honor. Honestly, I'm not sure. If the commission had proposed a rulemaking, possibly. I mean, certainly petitioners are shippers. I don't see that they were actually shippers on this particular pipeline in this proceeding at the time the pipeline canceled service. But they are shippers. We're not talking about a broad policy. You're saying they're making an attack on a broad policy. Right. Would they be permitted to make that sort of attack on a broad policy? I think they probably would to the extent that they are shippers across other pipelines in the country. I think they would. And certainly they have the ability to challenge any other pipeline's cancellation of service to the extent they're actually harmed by it. If there are no further questions, then thank you, Your Honors. Great. Thank you very much. I'll give you two minutes. If you only want one, that's fine. Okay. Thank you. Just to point out, I believe counsel for respondent has understated what the carrier has actually conceded. At page 11 of its brief, it said, and I quote, it is highly unlikely that any oil pipeline would ever again enter into a settlement agreement like the one at issue here without explicitly addressing the possibility of abandonment now that FERC has put the industry on notice, not that this is an existing policy, putting them on notice about the obligations implied in a rate settlement agreement. That is clear. That is now something that, as SuperTIRE would indicate, is a factor lurking in every negotiation between the carrier and the shipper going forward. In addition to the risk, counsel has indicated that we waited or somehow didn't exercise our rights quick enough. Thirty days after that complaint order was issued, we filed a request for a hearing. It took FERC nearly three years to address that request for a hearing. We had to wait for FERC to actually address the re-hearing so that we could appeal. And in addition to that, indicating that somehow we did not adequately keep FERC informed, you can look to JA site 0446, which is a status report dealing with the settlement discussions. And in footnote 1, we've identified, and we continue to identify, that petitioners were intending to preserve their rights so that they could challenge the legal policy underneath FERC's action. We did everything we could. We could have maybe started another proceeding, but the fact of the matter is that this was the proceeding. This was the proceeding where FERC issued its new policy. Now FERC can say all day long that this was not somehow a new policy, but the fact of the matter is as follows. The Interstate Commerce Act defines abandonment, and it defines abandonment as a complete termination of service on a facility or route. That definition is unambiguous. That definition is sitting in the ICA, and abandonment as contemplated by the ICA is what Congress defined abandonment in the ICA. So to the extent that an action does not meet the definition of abandonment under the ICA, it's not an abandonment. We have your argument. Thank you very much. The case is submitted.
judges: Griffith, Srinivasan, Wilkins